ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

FILED
JAN 25 2008
U.S. COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| TYLER CONSTRUCTION GROUP, | : | |
| Plaintiff, | : | |
| v. | : | No. 08-55 C |
| THE UNITED STATES, | : | |
| Defendant. | : | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, PERMANENT INJUNCTION AND DECLARATORY JUDGMENT**

Michael H. Payne, Esquire
Payne Hackenbracht & Sullivan
220 Commerce Dr., Suite 100
Ft. Washington, PA 19034
215-542-2777
215-542-2779(fax)
mhp@phslegal.com

Attorney of Record for
TYLER CONSTRUCTION GROUP

OF COUNSEL:

Joseph A. Hackenbracht, Esquire
Timothy A. Sullivan, Esquire
Payne Hackenbracht & Sullivan

# TABLE OF CONTENTS


Table of Authorities . . . . . ii

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, PERMANENT INJUNCTION AND DECLARATORY RELIEF . . . . . 1

I. Issues Presented . . . . . 1

II. Statement of the Case . . . . . 2

III. Argument . . . . . 5

A. Jurisdiction and Standard of Review . . . . . 5

B. The Use Of A Negotiated IDIQ Solicitation To Procure Open-Ended Construction Task Order Projects Violates Applicable Law and Regulations . . . . . 7

1. The Solicitation Violates Applicable Law and Regulation Governing the IDIQ Procurements . . . . . 8

2. The Solicitation Illegally Bundles Multiple Construction Projects In Violation of the Small Business Act . . . . . 20

3. The Solicitation Violates The Statutory Preference For Sealed Bidding In Construction Contracting . . . . . 24

C. The Proposed IDIQ Solicitation Is Arbitrary And Capricious . . . . . 27

D. Criteria For Injunctive Relief . . . . . 27

E. Likelihood of Success on The Merits . . . . . 28

F. Plaintiff Will Suffer Irreparable Harm If Relief Is Not Granted . . . . . 29

G. The Balance of Hardships Decidedly Favor Plaintiff . . . . . 30

H. Injunctive Relief Will Serve The Public Interest . . . . . 30

Conclusion . . . . . 31

# TABLE OF AUTHORITIES

**Cases**

A&D Fire Protection, Inc. v. U.S., 72 Fed. Cl. 126 (2006) .................................................. 15, 16

Abatement Contracting Corp. v. United States, 58 Fed. Cl. 594 (2003) .................................... 16

Bannum, Inc. v. United States, 404 F.3d 1346 (Fed.Cir. 2005) .................................................... 6

Blue and Gold Fleet, L.P. v. United States, 492 F.3d 1308 (Fed.Cir. 2007) ............................... 29

Data Gen. Corp. v. Johnson, 78 F.3d 1556 (Fed.Cir. 1996) ........................................................ 28

Erinys Iraq, Ltd. v. U.S., 2007 WL 2714167 (Fed. Cl. Sept. 14, 2007) ........................................ 5

Isratex, 25 Cl. Ct. 231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Magellan Corp v. United States, 27 Fed. Cl. 446 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28,29

Overstreet Electric Co. v. U.S., 47 Fed. Cl. 728 (2000) ............................................................ 29

PGBA, LLC v. United States, 389 F.3d 1219 (Fed.Cir. 2004) ...................................................... 6

Rex Serv. Corp. v. United States, 448 F.3d 1305 (Fed.Cir. 2006) ............................................... 5

Saratoga Dev. Corp. v. United States, 21 F.3d 445 (D.C.Cir. 1994) ............................................ 6

Schweiger Constr. Co. v. United States, 49 Fed. Cl. 188 (2001) ............................................... 16

Statistica, Inc. v. Christopher, 102 F.3d 1577 (Fed.Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . .28

TRW Environmental Safety Systems, Inc. v. United States, 16 Ct. Cl. 529 (1989). . . . . . . . . . .28

United Int'l Investigative Servs., Inc. v. United States,
41 Fed. Cl. 312 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29,30

Virginia Petroleum Jobbers Ass'n v. Federal Power Commission,
259 F.2d 291 (D.C. Cir. 1959). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Washington Metropolitan Area Transit Authority v. Holiday Inn,
559 F.2d 841 (D.C. Cir. 1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Weeks Marine, Inc. v. United States, 2007 WL 3277260 (Fed.Cl. November 06, ) ................ 6, 29

Winstar Comm. Inc. v. United States, 41 Fed. Cl. 748 (1998) ................ 6

**Statutes & Administrative Codes**

5 U.S.C. § 706 ................ 5

5 U.S.C. § 706(2)(A) ................ 6

10 U.S.C. § 2304 ................ 4, 27

10 U.S.C. § 2304(a) ................ 24

10 U.S.C. § 2304a ................ 8

10 U.S.C. § 2304a(b) ................ 9

10 U.S.C. § 2304a(d)(1)(A) ................ 9

10 U.S.C. § 2304a(d)(3)(A) ................ 9

10 U.S.C. § 2832 ................ 19

15 U.S.C. § 631 ................ 27, 28

15 U.S.C. § 631(a) ................ 20

15 U.S.C. § 631(j) ................ 21

15 U.S.C. § 631(j)(3) (2000) ................ 24

15 U.S.C. § 632(o)(2) ................ 22

15 U.S.C. § 644(e)(2)(B) ................ 23

28 U.S.C. § 1491(b)(1) . . . . . . . . . . . . . . . . 5

28 U.S.C. § 1491(b)(3). . . . . . . . . . . . . . . . 30

48 C.F.R. § 6.401(a),(b)(1) ................ 25

**Regulations**

FAR 1.102(b)(iii) ....................24
FAR 1.102-2(a)(5) ....................24
FAR 6.401 ....................4
FAR 6.401(a) ....................26
FAR 7.107(b) ....................23
FAR 14.103-1(a) ....................26
FAR Part 15 ....................3
FAR Part 16.5 ....................1
FAR 16.501-1 ....................11
FAR 16.501-2(b) ....................4
FAR 16.502(a) ....................9
FAR 16.504.................... 8
FAR 16.504(a)....................3
FAR 16.504(a)(4)....................10
FAR 16.504(a)(4)(iii)....................23
FAR 16.505....................15
FAR 16.505(a)(9)....................15
FAR 16.506(e) ....................10
FAR 36.101(c)....................4
FAR 36.103....................4
FAR 36.103(a) ....................31
FAR Part 37 ....................13

**Regulations**

DFARS 207.170 ........ 22

DFARS 207.170-3 ........ 19

DFARS 216.501(a)(1) ........ 14

AFARS 5107.170 ........ 22

AFARS 5116.5 ........ 14

EFARS 16.501 ........ 14

EFARS 16.501(b) ........ 14

EFARS 16.501(S-102(b)and (d)) ........ 17

EFARS 16.501(S-103(a)) ........ 18

EFARS 16.501(S-103(a)(5) ........ 14

EFARS 16.501(S-103(b)) ........ 20

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | | |
|---|---|---|
| TYLER CONSTRUCTION GROUP, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. |
| | : | |
| THE UNITED STATES, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, PERMANENT INJUNCTION AND DECLARATORY JUDGMENT**

Plaintiff, Tyler Construction Group, ("Tyler"), challenges the issuance of a solicitation by the U.S. Army Corps of Engineers, Norfolk District ("Corps") for the design and construction of military general instruction building complexes in a six state area through the use of Indefinite Delivery/Indefinite Quantity ("IDIQ") procurement. The Plaintiff requests the Court to enjoin the Corps from proceeding with Solicitation No. W91236-08-R-0001, and to direct the Corps to comply with the laws and regulations that provide for competition in the award of federal construction contracts and that prohibit the consolidation, or "bundling," of construction projects in a manner that severely limits and excludes participation by small business concerns.

## I. ISSUES PRESENTED

The issues in this case are (1) Whether the solicitation for the procurement of General Instruction Buildings in a six state area in the southeastern United States through the use of a negotiated Task Order Contract violates applicable procurement laws and regulations, and (2) Whether FAR 16.5 "supplies and services" IDIQ procurement procedures permit the issuance of

a solicitation for the design and construction of large construction projects and (3) Whether the solicitation amounts the unlawful consolidation or "bundling" of construction projects in violation of the Small Business Act and pertinent regulations that protect the interests of small business concerns, and (4) Whether the issuance of the solicitation is arbitrary and capricious and therefore without a rational basis.

## II. STATEMENT OF THE CASE

The Corps of Engineers has greatly expanded the use of Indefinite Delivery/Indefinite Quantity ("IDIQ") contracting in recent years for the procurement of construction projects. Historically, IDIQ contracts were utilized by federal agencies to procure supplies and services where items and definable services could be priced at the time of bidding and the government had the flexibility to order those supplies and services at various times and in various quantities over a period of years. The sudden infatuation with this contracting method by the Corps of Engineers, and its questionable application to the construction of large construction projects, including General Instruction complexes, provides the backdrop against which the Court is requested to examine the unique facts of this case.

The Corps of Engineers has issued a solicitation that proposes to award a "Multiple Award Order Contract (MATOC) for General Instruction Buildings in the Southeast Region (Georgia, North Carolina, Florida, Alabama, Kentucky, and Mississippi)", with a primary focus on work at Fort Benning and Fort Gordon in Georgia. Although titled a "MATOC," the solicitation states that only one contract is to be awarded. This "MATOC" is nothing more than an IDIQ contract that will result, in this case, in the award of up to $100 million worth of construction contracts to a single contractor who will enjoy the benefit of being able to receive

task order awards without competition on a project by project basis. In other words, although the initial contract will be awarded through competitive FAR, Part 15, Contracting by Negotiation procedures, there will be no further competition for ensuing the task order construction projects once the single source is selected.

The use of single source IDIQ contracting is generally frowned upon because it ultimately eliminates competition for all of the task order work. In the instant solicitation, what the government has done, is to take a design/build project for the construction of a "sample project," which could easily have been solicited as a stand-alone project, and has used it as the basis for the elimination of competition for the construction of other broadly defined military facilities, and possibly any kind of related military construction, in a six state area for up to five years.

The regulations, at FAR 16.504(a) state that:

> An indefinite-quantity contract provides for an indefinite quantity, within stated limits, of supplies or services during a fixed period. The Government places orders for individual requirements. Quantity limits may be stated as number of units or as dollar values.

The "quantity" in this solicitation is not expressed in terms of units of design/build general instruction building complexes, it is expressed in terms of so many dollars worth of construction (up to a limit of $100,000,000). As long as the task orders are not more than $100,000,000 each (Solicitation, page 133), and involve virtually any kind of military construction that could include "general instruction," those task orders would arguably come within the scope of the solicitation. The problem is that the construction of military facilities, or any other kind of military construction project, is not something that is encompassed by the term "supplies or services." Clearly, the Corps of Engineers is not procuring supplies, and if the object is to procure "services," those services are not identified and are not of a recurring nature. In fact, FAR, Part

36, which provides the regulations dealing with construction, makes a distinction between construction contracts, and contracts for supplies or services. FAR 36.101(c).

The Corps' plan is unduly restrictive of competition and amounts to an abuse of the IDIQ procurement process. Although the regulations permit the use of IDIQ procurements to acquire "supplies and services" for which there is a recurring need, the regulations do not explicitly or implicitly suggest that military construction projects are "supplies or services." See FAR 16.501-2(b). The application of this IDIQ procurement method to the acquisition of construction services that amount to large multi-million dollar military facilities is a violation of both law and regulation.

If permitted to proceed, the solicitation will have a potentially devastating effect on the Plaintiff, a small business concern, who will be denied the opportunity to compete for the individual construction projects that will be consolidated, or "bundled," into this single contract. Many of the construction projects that make up these military general instruction complexes, on an individual basis, would have provided prime contracting opportunities for small business concerns. Since there is no restriction on the minimum size of any ensuing task order, however, the successful contractor could be awarded any number of task orders less complicated than the sample project – ones that could be well within the capabilities of small business concerns like the Plaintiff.

The Competition in Contracting Act, 10 U.S.C. § 2304, provides a preference for the use of sealed bidding in procuring construction services, and that law is codified in FAR 36.103 and FAR 6.401. The subject procurement seeks to circumvent the law and regulations by taking a large design/build project and, through a bootstrap approach, use that project to justify the non-

competitive award of an unlimited number of task order projects over a five year period amounting to a total price of up to $100 million.

## III. ARGUMENT

### A. Jurisdiction and Standard of Review

The United States Court of Federal Claims has "jurisdiction to render judgment on an action by an interested party objecting to ... any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 § U.S.C. 1491(b)(1); Erinys Iraq, Ltd. v. U.S., 2007 WL 2714167, (Fed. Cl., Sept. 14, 2007). Section 1491(b)(2) explicitly provides that, in any action under 1491(b), "the court may award any relief that the court considers proper, including declaratory and injunctive relief."

The Competition in Contracting act defines "[t]he term 'interested party', with respect to a contract or a solicitation or other request for offers ... [as] an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." 31 U.S.C. § 3551(2)(A); see also Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed.Cir. 2006). Plaintiff, a small business construction contractor, has successfully performed a number of construction contracts for the Corps of Engineers and other federal agencies in the same geographic region that is encompassed by the subject solicitation. Therefore, as a prospective offeror on the types of construction projects that have been bundled into this solicitation, Plaintiff qualifies as an interested party and has standing to invoke the court's jurisdiction in this matter.

In evaluating an agency procurement decision the Administrative Procedure Act, 5 U.S.C. § 706 (the "APA") gives the court discretion to set aside agency action only if it is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); PGBA, LLC v. United States, 389 F.3d 1219, 1224-28 (Fed.Cir. 2004). Agency action is deemed to be arbitrary or capricious when it lacks any rational basis or is an abuse of discretion. Saratoga Dev. Corp. v. United States, 21 F.3d 445, 456 (D.C.Cir. 1994). In addition, agency procurement procedures that are contrary to applicable laws and regulations violate the APA standard. 5 U.S.C. § 706(2)(A); Bannum v. United States, 404 F.3d 1346 at 1351, (Fed. Cir. 2005). These standards form the framework by which to measure the Corps' decision to use negotiated IDIQ contracting procedures to procure open-ended construction services.

In an ordinary post-award protest, the plaintiff must demonstrate "substantial prejudice" by showing that there was a "substantial chance" it would have been awarded the contract but for the agency's error. Bannum, Inc. v. United States, 404 F.3d 1346, 1353 (Fed.Cir. 2005). This standard, however, cannot be applied in the context of a solicitation-based protest because the offerors have yet to submit proposals to the agency. In the context of a solicitation-based protest, the plaintiff may satisfy the prejudice requirement by showing that an unreasonable agency decision "created a non-trivial competitive injury which can be redressed by judicial relief." Winstar Comm. Inc. v. United States, 41 Fed.Cl. 748, 763 n.9 (1998). In a recent decision, the Court held that a party that brings a protest challenging the terms of a solicitation need not satisfy the "substantial chance for award" test, but rather need only identify a non-trivial competitive injury. Weeks Marine, Inc. v. United States, 2007 WL 3277260, Fed.Cl., November 06, 2007.

Under this solicitation, the Plaintiff would be precluded from consideration for award of the bundled contract. However, if the projects were procured as stand-alone solicitations, either as sealed bid or negotiated procurements, there is a substantial chance that Plaintiff would be the

lowest responsive and responsible bidder, or selected as the best value offeror, on some of the described projects in the southeastern United States during the next three years. This non-trivial competitive injury is capable of being redressed by the Court.

**B. The Use Of A Negotiated IDIQ Solicitation To Procure Open-Ended Construction Task Order Projects Violates Applicable Law And Regulation**

The solicitation provides for the award of a single IDIQ Contract for the design and construction of General Instruction Buildings on military installations in a six state area in the southeastern United States, based on the evaluation of proposals submitted on a "sample" project, the possible (but potentially only hypothetical) design and construction (maybe) of a General Instruction Complex at Fort Benning, Georgia Significantly, the solicitation does not preclude, or in any way prevent, the Corps of Engineers from issuing task orders for any type of military construction within the designated region, nor does it preclude the award of task orders for portions or components of the described "complexes" or "facilities," so long as the facility being procured is for the "general instruction" of the military.

The overly-broad scope of work gives the Corps the flexibility and the opportunity to issue task orders in the six listed states for any design and/or construction work that is related to the "transformation" of the Army, not just for the construction of "complexes" that are described in the solicitation. This possibility is supported by the fact that the Corps has not identified any task orders or proposed locations beyond the work identified in the sample project. The Corps clearly has reserved the open-ended opportunity to creatively procure design and construction services on what is effectively a sole source basis for the base year and four option years, limited only by the available funding. It is entirely conceivable, therefore, that task order construction projects could be awarded under the broad umbrella of the task order contract that would

otherwise be suitable as stand-alone projects within the capabilities of the small business construction contracting community.

An example of the Corps' creative adaptation of an IDIQ contract to issue task orders outside the apparent scope of the original contract currently exists in the same geographic region. The Corps issued a broad IDIQ contract for "general construction" in Georgia. (Contract No. W912HN-07-D-0053). The first task order, an Armored Training Facility, was issued for work in Georgia. The Corps subsequently issued a second task order for a Chaplaincy Center in South Carolina. The Corps obviously did not treat the geographic limitation in the contract as a restriction on its ability to issue task orders outside of the boundaries of the state of Georgia.

Similarly, since the current solicitation does not specifically limit the type of design or construction services to be performed, only that the services fall within the "general instruction" umbrella, the Corps may issue task orders for any design-build or construction project as long as it arguably supports the Army's transformation goal. In fact, as seen above in the Georgia contract, the Corps may even feel free to issue task order work beyond the six-state geographic region listed in the solicitation. Any such departure from the terms or intent of the original contract will be insulated from judicial review, however, because disappointed offerors will not have post-award standing to protest individual task orders, and the fortunate awardee will be unlikely to object to the sole source award of additional work.

### 1. The Solicitation Violates Applicable Law and Regulation Governing IDIQ Procurement

The use of task or delivery order contracts is authorized by the Federal Acquisition Streamlining Act of 1994 ("FASA"), 10 U.S.C. § 2304a, and FAR 16.504. FASA provides that a solicitation for a task or delivery order contract shall include the following:

**(1)** The period of the contract, including the number of options to extend the contract and the period for which the contract may be extended under each option, if any.

**(2)** The maximum quantity or dollar value of the services or property to be procured under the contract.

**(3)** A statement of work, specifications, or other description that reasonably describes the general scope, nature, complexity, and purposes of the services or property to be procured under the contract. 10 U.S.C. § 2304a(b).

The law further provides that the head of an agency must approve a single task order or delivery contract, 10 U.S.C. § 2304a(d) (1)(A), and the law further provides a preference for the award of multiple, rather than single, task or delivery order contracts. 10 U.S.C. 2304a(d)(3)(A).

The Federal Acquisition Regulation addresses the subject of Indefinite Delivery Contracts (IDCs) in Part 16.5. The regulation states that "This subpart prescribes policies and procedures for making awards of indefinite-delivery contracts and establishes a preference for making multiple awards of indefinite-quantity contracts." FAR 16.500(a). There are three types of indefinite delivery contracts: definite-quantity contracts, requirements contracts, and indefinite-quantity contracts. FAR 16.502(a).

The applicable Federal Acquisition Regulations provide that a solicitation and contract for an indefinite quantity must —

(i) Specify the period of the contract, including the number of options and the period for which the Government may extend the contract under each option;

(ii) Specify the total minimum and maximum quantity of supplies or services the Government will acquire under the contract;

(iii) Include a statement of work, specifications, or other description, that reasonably describes the general scope, nature, complexity, and purpose of the supplies or services the Government will acquire under the contract in a manner that will enable a prospective offeror to decide whether to submit an offer;

(iv) State the procedures that the Government will use in issuing orders, including the ordering media, and, if multiple awards may be made, state the procedures and selection criteria that the Government will use to provide awardees a fair opportunity to be considered for each order (see 16.505(b)(1));

(v) Include the name, address, telephone number, facsimile number, and e-mail address of the agency task and delivery order ombudsman (see 16.505(b)(5)) if multiple awards may be made;

(vi) Include a description of the activities authorized to issue orders; and

(vii) Include authorization for placing oral orders, if appropriate, provided that the Government has established procedures for obligating funds and that oral orders are confirmed in writing.

FAR 16.504(a)(4).

The solicitation includes the clause prescribed by FAR 16.506(e), as follows:

Indefinite Quantity (Oct 1995)

(a) This is an indefinite-quantity contract for the supplies or services specified, and effective for the period stated, in the Schedule. The quantities of supplies and services specified in the Schedule are estimates only and are not purchased by this contract.

(b) Delivery or performance shall be made only as authorized by orders issued in accordance with the Ordering clause. The Contractor shall furnish to the Government, when and if ordered, the supplies or services specified in the Schedule up to and including the quantity designated in the Schedule as the "maximum." The Government shall order at least the quantity of supplies or services designated in the Schedule as the "minimum."

(c) Except for any limitations on quantities in the Order Limitations clause or in the Schedule, there is no limit on the number of orders that may be issued. The Government may issue orders requiring delivery to multiple destinations or performance at multiple locations.

(d) Any order issued during the effective period of this contract and not completed within that period shall be completed by the Contractor within the time specified in the order. The contract shall govern the Contractor's and Government's rights and obligations with respect to that order to the same extent as if the order were completed during the contract's effective period; *provided*,

that the Contractor shall not be required to make any deliveries under this contract after _______________ [*insert date*].

The solicitation provides for the selection of a single contractor (that may be a joint venture or a team) that will be selected after a two-step proposal process. (Amendment 0001, page 39). The resulting single award contract will enable the selected contractor to become the sole source for the negotiation of task orders that can be as much as $100,000,000 in value. (Solicitation, page 133). A "task order contract" is defined as a "contract for services that does not procure or specify a firm quantity of services (other than a minimum or maximum quantity) and that provides for the issuance of orders for the performance of tasks during the period of the contract." FAR 16.501-1.

While the law and regulations provide for the procurement of both supplies and services, an IDIQ contract has historically been used for the procurement of virtually identical supplies or services, for which there is a recurring need, on a single installation or within a small geographic area. The unit cost of these supplies or services has not generally amounted to millions of dollars per unit. For example, an agency might have a recurring need to purchase a particular part at indefinite times and for indefinite quantities. An IDIQ contract gives the agency the right to order those parts, at an established price, at various times and in various quantities within the duration of the contract. Similarly, something like janitorial services, priced in advance at a daily or hourly rate, can easily be ordered on as needed basis. Construction "services," however, are not so straightforward.

While it is conceivable that construction "services" like roofing repairs could be priced in advance and ordered as needed, the procurement of a large military complex and facility is site specific and may vary significantly in cost depending on location, the local construction labor

market, the fluctuating cost of materials, the weather, and many other factors. It is one thing to order 1,000 widgets one month and 1,500 widgets the next month, but is quite another thing to order quantities of military complexes.

Although the term "services" is not defined in the context of the "supplies or services" that may be acquired under an IDIQ contract (FAR 16.5), or as the term is used within the context of task orders as described in FAR 16.501-1, the regulations provide some insight into what is intended when supplies or services are procured by the IDIQ method. The regulations offer the following "advantages" for all three types of indefinite delivery contracts:

> b) The various types of indefinite-delivery contracts offer the following advantages:
>
> (1) All three types permit—
>
> (i) Government stocks to be maintained at minimum levels; and
>
> (ii) Direct shipment to users.
>
> (2) Indefinite-quantity contracts and requirements contracts also permit—
>
> (i) Flexibility in both quantities and delivery scheduling; and
>
> (ii) Ordering of supplies or services after requirements materialize.
>
> (3) Indefinite-quantity contracts limit the Government's obligation to the minimum quantity specified in the contract.
>
> (4) Requirements contracts may permit faster deliveries when production lead time is involved, because contractors are usually willing to maintain limited stocks when the Government will obtain all of its actual purchase requirements from the contractor.

All of these advantages pertain to items in the nature of supplies and do not suggest, in any way, the procurement of large design/build military buildings and complexes. This is a perfectly logical and reasonable observation given the clear distinction that the FAR generally makes in

describing "supplies" (the subject of many FAR provisions and clauses), "services" (FAR, Part 37) and "construction" (FAR, Part 36; FAR 36.101(c)). Yet, both FAR 16.5 and EFARS 16.5, in providing the rules regarding all types of indefinite delivery contracts only mention "supplies and services" and do not mention "construction" even once.

FAR, Part 37, does address "services," however, in defining service contracts, as follows:

> "Service contract" means a contract that directly engages the time and effort of a contractor whose primary purpose is to perform an identifiable task rather than to furnish an end item of supply. A service contract may be either a nonpersonal or personal contract. It can also cover services performed by either professional or nonprofessional personnel whether on an individual or organizational basis. Some of the areas in which service contracts are found include the following:
>
> (1) Maintenance, overhaul, repair, servicing, rehabilitation, salvage, modernization, or modification of supplies, systems, or equipment.
>
> (2) Routine recurring maintenance of real property.
>
> (3) Housekeeping and base services.
>
> (4) Advisory and assistance services.
>
> (5) Operation of Government-owned equipment, real property, and systems.
>
> (6) Communications services.
>
> (7) Architect-Engineering (see Subpart 36.6).
>
> (8) Transportation and related services (see Part 47).
>
> (9) Research and development (see Part 35).

What is interesting, and instructive, is that none of these "services" refer to construction, other than possibly maintenance and repair and, most assuredly, nothing on this list describes the construction of large military buildings or complexes of the sort envisioned by this solicitation.

In fact, even the supplemental federal acquisition regulations do not anticipate the huge scale of the "services" proposed by this solicitation. The Defense Federal Acquisition Regulation

Supplement ("DFARS"), for example, speaks of using indefinite delivery contracts to procure items with a shelf-life of less than six months. See DFARS 216.501(a)(i). The Army Federal Acquisition Regulation Supplement ("AFARS") only addresses indefinite delivery contracts in the context of multiple award task orders. See AFARS 5116.5. Even the Corps of Engineers' own procurement regulations do not specifically address the acquisition of construction through the IDIQ method that is being applied here.

The Engineer Federal Acquisition Regulation Supplement ("EFARS") applies to all of the Corps' indefinite delivery contracts ("IDCs") and provides that:

> The scope of each IDC shall be as specific as possible, rather than consolidating a broad range of services or supplies (such as multiple North American Industrial Classification System (NAICS) codes), and limited to known or reasonably expected requirements within the geographical boundaries of the originating organization or regional business center.

EFARS 16.501(b). This would not seem to encompass or anticipate the construction of multiple and varying large design/build military buildings and complexes as proposed by the solicitation. Indeed the broad range of the design services required includes architectural, civil, mechanical, electrical, and structural engineering disciplines, as well a variety of construction contractors including general, electrical, mechanical, earthmoving, paving, roofing, highway, and any number of specialty contractors. If this is not the consolidation of a broad range of services, it is difficult to conceive of what would qualify as such a consolidation.

EFARS 16.501 contemplates that a particular IDIQ contract for supplies or services will be used on one installation, not for unspecified military installations in six states, as in this solicitation. (See EFARS 16.501 (S-103)(a)(5), wherein the agency is to address whether management of more than one contractor <u>on an installation</u> presents unacceptable administration

problems, emphasis added.) There is no reasonable justification under EFARS 16.5 to designate such an expansive region for the application of this IDIQ contract.

The issue of whether contracts for construction can be solicited using the IDIQ supplies and services procedures specified in FAR 16.505 has, according to our research, only been addressed once by the Court, and even then the Court only dealt with the issue in a tangential manner. The Court stated that "there does not appear to be any impediment to using supplies and services IDIQ contracts, described by FAR subpart 16.5, for contracts which are specifically for construction services or construction-related services." A&D Fire Protection, Inc. v. U.S., 72 Fed.Cl. 126 (2006). The case principally dealt with the issue of whether the plaintiff was barred by statute from protesting the award of a task order under an existing IDIQ contract, and the Court concluded that the FAR 16.505(a)(9) prohibition on the protest of task order awards applied to protests on "construction services or construction-related services contracts." A&D Fire Protection, at page 136. (The contract had been awarded by the GSA for "Repair and Alterations, Renovations and other Construction Related Services" in Arizona, Nevada and/or California, and the plaintiff was one of multiple awardees eligible to compete for the various task orders).

Although it played no part in the Court's ultimate ruling that the plaintiff was barred by statute from filing a protest, the Court noted that the plaintiff had asserted at oral argument, for the first time, that the master IDIQ contract and the task order at issue were for "construction services." The plaintiff argued that "construction services" could not be procured under the procedures provided by FAR 16.505 because that section of the FAR applied only to "supplies and services, not construction." The Court disagreed and concluded that "there does not appear

to be any impediment to using supplies and services IDIQ contracts, described by FAR subpart 16.5 for contracts which are specifically for construction services or construction-related services."

In its discussion of "construction services or construction-related services" the Court cited Abatement Contracting Corp. v. United States, 58 Fed.Cl. 594, 595, 604 (2003), a case that dealt with a dispute involving an indefinite delivery contract entitled "Requirements Contract for Asbestos Removal and Insulation Installation, U.S. Naval Academy and U.S. Naval Station, Annapolis, Maryland"; and, Schweiger Constr. Co. v. United States, 49 Fed.Cl. 188, 190, 194 (2001), a case that dealt with an "Indefinite Quantity Term Construction Contract" issued by the GSA for work that was to involve "relatively small, repetitive, unscheduled construction services in GSA owned or leased buildings in the Kansas City metropolitan area where, based on past needs or requirements, the government expected similar services would be required during the contract term." It is significant that both of the examples cited by the Court were contracts that dealt with definable services which could be priced in advance on a bid schedule and ordered much in the same way that supplies are ordered.

While the work in the cases cited as examples may have generally related to construction, it was more in the nature of "supplies and services" than construction. Therefore, although the Court noted that it found "no caselaw forbidding the government from using the IDIQ supplies and services contracting vehicle described in FAR 16.504 and 16.505 in the construction context," A&D Fire Protection, Inc. v. U.S., 72 Fed.Cl. 126, at 136 (2006), this does not mean that the Court found that the term "supplies and services" encompasses the sort of major military construction projects envisioned by the instant solicitation. Most assuredly, the examples cited

by the Court did not equate, in any way, to the kind of major construction projects being solicited by the Corps of Engineers in this case.

It is also significant that the Court used the phrase "IDIQ supplies and services contracting vehicle" in referring to the procedures specified in FAR 16.5. As stated previously in this Memorandum, there are supply contracts, there are service contracts, and there are construction contracts in federal procurement. The collective term "supplies and services" as that term is used in FAR 16.5, and as implicitly recognized by the Court in the A&D Fire Protection Case, supra, is not a term that applies to the construction of the large military buildings and complexes and related military construction projects being solicited here. These projects cannot legally or rationally be procured by the Corps as if they are commodities in the nature of fuel oil, supplies in the nature of paper clips, or services in the nature of minor repairs, by employing a contracting method that excludes the sizeable small business construction community from participating, as prime contractors, in the competition for $100 million worth of major construction work.

The fact that the military buildings and complexes being procured are not susceptible to inclusion within the term "supplies and services" is further demonstrated by the Corps' failure to identify with specificity any project or workload, and only including a "sample" project in the solicitation. The "quantity" for purposes of the "indefinite-quantity" portion of the term "IDIQ" is nothing more, in this solicitation, than a quantity of potential dollars to be spent. This lack of specificity makes it impossible for any offeror to evaluate the nature or location, within any of the listed six states, of other task orders that might be solicited under this proposed contract and violates the requirements of EFARS 16.501 (S-102)(b) and (d). In fact, the Corps has failed to

even include an estimated workload for the base year and each of the option years. Again, it simply chose to advise offerors that the overall program amount may not exceed 100 million dollars.

It must be noted that the agency's procurement regulations place substantial restrictions on the situations in which indefinite delivery contracts can be used at all. The restrictions are clearly enunciated in the Corps' regulations, as follows:

> IDC [indefinite delivery contracts] may be used *only if* one or more of the following conditions applies -
>
> 1) The cost to procure the required services or supplies individually through normal selection procedures is uneconomical compared to the cost of the services or supplies themselves;
>
> 2) The time required to procure the required services or supplies individually through normal selection procedures will cause an unacceptable delay in fulfilling the requirements;
>
> 3) Technical continuity among related requirements is essential;
>
> 4) Significant cost savings in contract price and/or contract administration will accrue by having a single contractor perform several similar requirements; or
>
> 5) Management of more than one contractor on an installation presents unacceptable administration problems in such areas as coordination and movement of work forces and equipment, separation and acceptance of contractor responsibility, and verification of performance and progress.

EFARS 16.501, S-103(a). These conditions clearly do not apply to this proposed procurement scheme to accomplish the Corps' broadly defined scope of work in the southeastern United States.

First of all, even if it may be less expensive for the government to award one single task order contract instead of a number of individual construction contracts, that alone is not a basis to justify the sole source procurement of $100 million worth of construction contracts. If that were

the case, sole source procurements could always be justified and would quickly become the rule, rather than the exception.

Secondly, given the fact that only the sample project has been defined, there is no basis to conclude that the time required to procure the anticipated construction work using normal selection procedures would result in an unacceptable delay. In fact the government would undoubtedly be able to save time and money by procuring portions of the projects through the use of sealed bid procedures in view of the funding limitations that frequently delay larger scale procurements.

Thirdly, there is no reason to conclude that technical continuity among related requirements is so essential that these military buildings and complexes can only be procured through the use of a single source. Each one of these buildings and complexes is site specific and it will be difficult, if not impossible, to use a "cookie-cutter" approach to the construction at each installation. Even if that were the case, moreover, there would be no need to have a design/build contract in place because many contractors could build the structures according to a completed design.

The fourth requirement, that there be a cost savings in contract administration, is impossible to predict without knowing how many task orders will be issued and what administrative difficulties may be encountered in executing them. Once again, it is also submitted that any estimated administrative cost savings to the Corps will be more than offset by the ultimate cost of issuing non-competitive task orders. In fact, it is respectfully submitted that the Court should take judicial notice of the fact that sealed bidding unquestionably results in the lowest prices to the government. In addition, both 10 U.S.C. 2832 and DFARS 207.170-3,

clearly admonish contracting personnel that cost savings in administrative and personnel costs are not to be considered sufficient justification for consolidation of contract requirements.

The fifth, and last factor listed in the Corps' regulations, EFARS 16.501, addresses the issue of whether an IDIQ contract may be justified because of the administrative problems associated with having multiple contractors on one installation. That would seem to envision the employment of a single contractor to perform construction services in the nature of repairs, not the employment of a single contractor to design and build a number of military buildings and complexes without competition.

It is also very important to note that EFARS 16.5 requires the Corps to consider the dollar amount for each individual contract when establishing the basis for using an indefinite delivery type of contract. Among the factors that the Corps must consider is the capability of small businesses to compete for the required work. (EFARS 16.501 (S-103)(b). The solicitation has defined small businesses as those contractors with average annual receipts of 31 million dollars per year. By setting the maximum amount of the task orders that can be issued under the IDIQ solicitation at 100 million dollars, it is apparent that the Corps has not given realistic or appropriate consideration to the ability of small businesses to compete for the required work given the disparity in the size standard compared to the potential workload.

**2. The Solicitation Illegally Bundles Multiple Construction Projects In Violation Of The Small Business Act**

The Small Business Act, 15 U.S.C. § 631(a) provides that:

> The essence of the American economic system of private enterprise is free competition. Only through full and free competition can free markets, free entry into business, and opportunities for the expression and growth of personal initiative and individual judgment be assured. The preservation and expansion of such competition is basic not only to the economic well-being but to the security

> of this Nation. Such security and well-being cannot be realized unless the actual and potential capacity of small business is encouraged and developed. It is the declared policy of the Congress that the Government should aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns in order to preserve free competitive enterprise, to insure that a fair proportion of the total purchases and contracts or subcontracts for property and services for the government (including but not limited to contracts or subcontracts for maintenance, repair, and construction) be placed with small-business enterprises, to insure that a fair proportion of the total sales of Government property be made to such enterprises, and to maintain and strengthen the overall economy of the Nation.

To comply with this statement of congressional policy, federal law also requires that:

> . . .each Federal agency, to the maximum extent practicable, shall--
>
> (1) comply with congressional intent to foster the participation of small business concerns as prime contractors, subcontractors, and suppliers;
>
> (2) structure its contracting requirements to facilitate competition by and among small business concerns, taking all reasonable steps to eliminate obstacles to their participation; and
>
> (3) avoid unnecessary and unjustified bundling of contract requirements that precludes small business participation in procurements as prime contractors.

15 U.S.C. §631(j).

To implement this restriction, the Small Business Act defines bundling as "consolidating 2 or more procurement requirements for goods or services previously provided or performed under separate smaller contracts into a solicitation of offers for a single contract that is likely to be unsuitable for award to a small-business concern due to-

> (A) the diversity, size, or specialized nature of the elements of the performance specified;
>
> (B) the aggregate dollar value of the anticipated award;
>
> (C) the geographical dispersion of the contract performance sites; or

> (D) any combination of the factors described in subparagraphs (A), (B), and (C). 15 U.S.C. § 632(o)(2); *see also* FAR sect. 2.101.

(The Department of Defense and the Department of the Army both refer to "bundling" as "consolidation of contract requirements" in their regulations). (DFARS 207.170; AFARS 5107.170).

The essential problem with this procurement is that the contracting community has no way of knowing whether the ensuing task orders will be made up of projects that would have been suitable for award to small business or not. The Corps of Engineers has only defined the sample project which, in fact, may not even be awarded, and has reserved the open-ended right to define the scope and size of ensuing task orders as it sees fit. In doing so, not only are the delivery and the quantity indefinite, the makeup and size of the projects themselves are also indefinite. That is not what is intended by an IDIQ contract. In fact, FAR 16.504(a)(4)(iii) provides that an IDIQ contract must:

> Include a statement of work, specifications, or other description, that reasonably describes the general scope, nature, complexity, and purpose of the supplies or services the Government will acquire under the contract in a manner that will enable a prospective offeror to decide whether to submit an offer.

The scope of work in the solicitation itself, while generally described, is to be priced by inserting a price on one CLIN ("Contract Line Item Numbers") on the bid schedule. This only serves to highlight what a mockery this procurement makes of the IDIQ process; the Corps of Engineers cannot even describe, for price comparison purposes, what service or "quantity" it is actually attempting to procure in this IDIQ solicitation. The solicitation provides absolutely no basis for offerors to price their proposals and therefore provides no basis to consider price in the

selection of the contractors to be short-listed after Phase 1. In doing so, the solicitation violates FAR 16.504(a)(4)(iii), as described above.

It must be noted, however, that the Small Business Act's statutory prohibition against bundling requirements is not absolute, and an agency may determine that consolidation of requirements is "necessary and justified if, as compared to the benefits that would be derived from contracting to meet those requirements if not consolidated, the Federal Government would derive from the consolidation measurably substantial benefits, including any combination of benefits that, in combination, are measurably substantial." 15 U.S.C. § 644(e)(2)(B). The FAR states that these benefits may be identified as follows:

> Measurably substantial benefits may include, individually or in any combination or aggregate, cost savings or price reduction, quality improvements that will save time or improve or enhance performance or efficiency, reduction in acquisition cycle times, better terms and conditions, and any other benefits. The agency must quantify the identified benefits and explain how their impact would be measurably substantial. Except as provided in paragraph (d) of this section, the agency may determine bundling to be necessary and justified if, as compared to the benefits that it would derive from contracting to meet those requirements if not bundled, it would derive measurably substantial benefits equivalent to-ten percent of the estimated contract or order value (including options) if the value is $86 million or less. FAR sect. 7.107(b).

The bundling of the types of straightforward, easily segregable, construction projects that make up the military facilities envisioned by the solicitation will not provide the kind of measurably substantial benefits sufficient to justify the non-competitive award of task orders amounting to as much as $100 million. In fact, the harm that will accrue to both the large and small business concerns who will be excluded from the right to compete for that work is immeasurable in terms of lost opportunities and lost jobs.

There are 2,220 small business contractors under the applicable NAICS code and not one of them will qualify for the award of the prime contract work being solicited here. (See www.ccr.gov). Accordingly, the procurement is in direct violation of the Small Business Act and its requirement that "to the maximum extent practicable," each agency shall "avoid unnecessary and unjustified bundling of contract requirements that precludes small business participation in procurements as prime contractors." 15 U.S.C. § 631(j)(3) (2000).

### 3. The Solicitation Violates The Statutory Preference For Sealed Bidding in Construction Contracting

It is a "guiding principle" of the Federal Acquisition System that federal agencies are to promote competition in procurement. FAR 1.102(b)(iii); FAR 102-2(a)(5). The general requirement to use competitive procedures in government procurements is codified in 10 U.S.C. § 2304(a), as follows:

> **§ 2304. Contracts: competition requirements**
>
> (a)(1) Except as provided in subsections (b), (c), and (g) and except in the case of procurement procedures otherwise expressly authorized by statute, the head of an agency in conducting procurement for property or services—
>
> (A) shall obtain full and open competition through the use of competitive procedures in accordance with the requirements of this chapter and the Federal Acquisition Regulation; and
>
> (B) shall use the competitive procedure or combination of competitive procedures that is best suited under the circumstances of the procurement.
>
> (2) In determining the competitive procedure appropriate under the circumstances, the head of an agency–
>
> (A) *shall* solicit sealed bids if–
>
> (i) time permits the solicitation, submission, and evaluation of sealed bids;

(ii) the award will be made on the basis of price and other price-related factors;

(iii) it is not necessary to conduct discussions with the responding sources about their bids; and

(iv) there is a reasonable expectation of receiving more than one sealed bid; and

(B) *shall* request competitive proposals if sealed bids are not appropriate under clause (A).

(Emphasis supplied). These criteria have also been codified in FAR 6.401, as follows:

**6.401 Sealed bidding and competitive proposals.**

Sealed bidding and competitive proposals, as described in Parts 14 and 15, are both acceptable procedures for use under Subparts 6.1, 6.2; and, when appropriate, under Subpart 6.3.

(a) Sealed bids. (See part 14 for procedures.) Contracting officers *shall* solicit sealed bids if–

(1) Time permits the solicitation, submission, and evaluation of sealed bids;

(2) The award will be made on the basis of price and other price-related factors;

(3) It is not necessary to conduct discussions with the responding offerors about their bids; and

(4) There is reasonable expectation of receiving more than one sealed bid.

(b) Competitive proposals. (See FAR, Part 15, for procedures.)

(1) Contracting officers may request competitive proposals if sealed bids are not appropriate under paragraph (a) above. . . . .

48 C.F.R. 6.401(a), (b)(1). Thus, whenever the four enumerated criteria are met, both statute and regulation <u>require</u> that sealed bids be solicited under FAR 14, and <u>not</u> competitive proposals

under FAR 15. See also FAR 14.103-1(a), which provides that "[s]ealed bidding shall be used whenever the conditions in 6.401(a) are met" (emphasis supplied).

Accordingly, the question presented in this proceeding is whether or not the employment of a negotiated task order procurement by the Corps is in violation of the statute and the FAR. Plaintiff submits that although there may be a justification to utilize FAR, Part 15, contracting by negotiation procedures for the sample project if it were, in fact, an actual design/build task order, there is no basis to conclude that sealed bidding will not be appropriate for the ensuing, and yet undefined, future task order work. That is one of the major problems with this procurement – once the proposed task order contract is in place, each and every task order will have been pre-ordained as suitable for non-competitive, negotiated procurement. Thus, if the Corps decides to employ the task order contractor to build a $1 million facility, something that clearly would be suitable for sealed bidding by large and small business concerns, there will be nothing to prevent the Corps from doing so and the construction contracting community will be left without a remedy.

The FAR provides for two basic forms of procurement: Sealed Bidding under FAR, Part 14, and Contracting by Negotiation under FAR, Part 15. The statutory requirement for competitive procurement is an integral part of both of those acquisition procedures. What the Corps is attempting to do, for the apparent sake of expediency, is to use competitive negotiated procedures to select a contractor who will then perform ensuing task orders without competition. Through a distortion of the IDIQ procurement vehicle, the Corps of Engineers is violating the spirit, intent, and letter of federal procurement law and regulation.

**C. <u>The Proposed IDIQ Solicitation Is Arbitrary And Capricious</u>**

The proposed IDIQ solicitation creates a protective umbrella under which the selected contractor can freely be awarded non-competitive task orders for large military buildings and complexes like the sample project, or for any construction work that the agency, in its discretion, decides to procure as long as it qualifies as "general instruction" facilities for the military. In this regard, the solicitation not only violates the Small Business Act, (15 U.S.C. § 631, *et seq.*), the Competition in Contracting Act, (10 U.S.C. § 2304), and the various procurement regulations cited in the preceding sections, it arbitrarily and capriciously denies the Plaintiff a fair opportunity to compete for millions of dollars worth of construction projects. There is no rational basis for taking <u>all</u> of the construction activities that make up the construction of the military buildings and complexes described in the solicitation, and reserving that work for one fortunate contractor to the exclusion of the entire small business contracting community.

**D. <u>Criteria For Injunctive Relief</u>**

In order to obtain temporary injunctive relief, the Plaintiff must demonstrate:

(1) substantial probability that the Plaintiff will prevail on the merits;

(2) irreparable harm to the Plaintiff unless the injunction is granted;

(3) absence of substantial harm to other interested parties; and

(4) absence of harm to the public interest.

<u>Virginia Petroleum Jobbers Ass'n v. Federal Power Commission</u>, 259 F.2d 921 (D.C. Cir. 1959). However, the evidence presented for each of these criteria is balanced by the court on a sliding scale basis. A much stronger showing on one or more of the necessary factors lessens the

amount of proof required for the remaining factors. Washington Metropolitan Area Transit Authority v. Holiday Inn, 559 F.2d 841 (D.C. Cir. 1972).

The Plaintiff will address the four above enumerated factors in light of the facts and applicable cases. For the reasons set forth below, Plaintiff submits that it is entitled to the relief sought.

### E. Likelihood of Success on The Merits

In considering whether to grant interim injunctive relief pending a final decision on the merits, the Court of Federal Claims has consistently held that the "likelihood of success" is a flexible factor and does not require a certain "mathematical probability." Magellan Corp v. United States, 27 Fed. Cl. 446, (1993); TRW Environmental Safety Systems, Inc. v. United States, 16 Cl.Ct. 516 (1989). For purposes of a preliminary injunction, it is sufficient if the plaintiff can demonstrate either (1) "a combination of probable success on the merits and the possibility of irreparable injury," or (2) "that serious questions are raised and the balance of hardships tips sharply in favor" of the plaintiff. Id. at 527. As demonstrated below, Plaintiff's request for preliminary injunctive relief meets these standards.

To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process. See Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed.Cir.1996); Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed.Cir.1996). In the case at hand, the use of IDIQ procurement procedures under FAR 16.5, that are intended to apply to the recurring need to obtain supplies and services, to the procurement of large, site specific, military buildings and complexes is a distorted and illegal use of this procurement vehicle. The Small Business Act (15 U.S.C. § 631, *et seq.*) prohibits the bundling of individual projects in a manner that because of

the accumulated size and geographic dispersion will make the resulting large project unsuitable for small business. Accordingly, the clear violation of procurement law and regulation makes it likely that the Plaintiff will prevail on the merits.

### F. Plaintiff Will Suffer Irreparable Harm If Relief Is Not Granted

When assessing irreparable injury, "[t]he relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction." Magellan Corp. v. United States, 27 Fed.Cl. 446, 447 (1993). While the harm to Plaintiff is somewhat speculative, the Federal Circuit recently held that the proper time for a protest against the terms of the solicitation is before the bids or proposals are submitted. Blue and Gold Fleet, L.P. v. United States, 492 F.3d 1308,1313 (Fed.Cir. 2007) Consequently, if Plaintiff were required to wait until it could show a non-speculative harm after award, it would lose its right to protest the terms of the solicitation. As the Court recently held, the only time for a party to bring a protest of the terms of a solicitation is before proposals are due, as Plaintiff here has done, and the only remedy that will satisfy the protest is for the Court to enter injunctive relief. Weeks Marine, Inc. v. United States, 2007 WL 3277260, Fed.Cl., November 06, 2007.

Furthermore, the Plaintiff will suffer irreparable harm if an injunction is not granted because of the potential loss of valuable business that it could otherwise obtain under the required procurement procedures. This type of loss, deriving from a lost opportunity to compete in a fair competitive process for a contract, has been found sufficient to prove irreparable harm. Overstreet Electric Co. v. U.S., 47 Fed.Cl. 728 (2000); United Int'l Investigative Servs., Inc. v. United States, 41 Fed.Cl. 312, 323 (1998).

The loss of contract awards that the Plaintiff would have received under stand alone procurements mandated by the law and applicable regulations will be unavoidable if an injunction is not issued and if the Defendant is permitted to proceed. If an injunction is not issued, Plaintiff will be denied the benefit of a legally valid procurement process as well as a fair opportunity to compete.

### G. <u>The Balance of Hardships Decidedly Favor Plaintiff</u>

The Court must consider whether a preliminary injunction will substantially injure the other parties in the proceeding. As discussed above, if Plaintiff's request for injunctive relief is not granted, it will suffer the loss of an opportunity to fairly compete and to earn the profits associated with receiving contract awards. This outweighs any potential harm to the Corps of Engineers. As noted in the Court's General Order No. 38, the "Court's practice is to expedite protest cases to the greatest practical extent," and Plaintiff is prepared to agree to an expedited schedule for resolving this matter. See 28 U.S.C. §1491(b)(3) ("[i]n exercising jurisdiction under this subsection, the courts shall give due regard to . . . the need for expeditious resolution of the action"). Given the Court's practice to expedite bid protests, it is unlikely that the Corps will suffer irreparable injury during the pendency of this litigation.

### H. <u>Injunctive Relief Will Serve The Public Interest</u>

It is a well-settled principle that there is an overriding public interest in preserving the integrity of the federal procurement process by requiring the Government to follow its procurement statutes and regulations. See <u>United Int'l Investigative Services, Inc., v. U.S.</u>, 41 Fed. Cl. 312,323 (1998) holding that the "public has a strong interest in preserving the integrity of the procurement process"; <u>Isratex</u>, 25 Cl.Ct. at 231 (public interest served by requiring the

government to "fairly and honestly" consider bids). The public interest is always served when the procurement procedures required by law and regulation are followed. Issuance of an injunction will serve the public interest by protecting the integrity of the competitive procurement process.

**CONCLUSION**

Federal agencies, and the Corps of Engineers in particular, have become over-zealous in their desire to streamline the acquisition process. While the goal may be admirable, the shift to what effectively amounts to a new procurement system without statutory or regulatory authority must not be permitted. In place of sealed bidding, the preferred method to procure construction contracting under FAR 36.103(a), the Corps has improvised by employing the "supplies and services" IDIQ procedures in FAR 16.5 to procure multi-million dollar construction projects in the same way that the government procures office supplies.

The resulting task order contracts unfairly reward a very few contractors with the opportunity to perform hundreds of millions of dollars of construction work with little or no competition, and exclude small business concerns from any real opportunity to be awarded prime contracts with the Federal government. This is particularly egregious because these "bundled" MATOC procurements consist of many projects that, individually, have historically been performed by small business concerns.

Plaintiff respectfully submits that the requested relief is urgently needed to maintain the status quo until the Court reaches a decision on the merits. Based on the foregoing facts and analysis, Plaintiff respectfully requests the Court to grant its motion.

Respectfully submitted,

DATED: 1-24-08

Michael H. Payne, Esquire
Payne Hackenbracht & Sullivan
220 Commerce Dr., Suite 100
Ft. Washington, PA 19034
215-542-2777
215-542-2779(fax)
mhp@phslegal.com

Attorney of Record for
TYLER CONSTRUCTION GROUP

OF COUNSEL:

Joseph A. Hackenbracht, Esquire
Timothy A. Sullivan, Esquire
Payne Hackenbracht & Sullivan